# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# COOKEVILLE DIVISION

| | |
|---|---|
| SANDRA BALLARD, | ) |
| Plaintiff, | ) ) ) |
| | ) No. 2:10-0008 |
| v. | ) ) Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION, | ) ) |
| Defendant. | ) |

TO: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401 through 433, and supplemental security income ("SSI") payments under Title XVI of the Act, 42 U.S.C. §§ 1381 through 1383f. The case is currently pending on Plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which Defendant has responded (Docket Entry No. 14). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 8),[1] and for the reasons given below, the undersigned Magistrate Judge recommends that Plaintiff's motion for judgment be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

## I. Introduction

Plaintiff filed her DIB and SSI applications on February 21, 2006. (Tr. 13, 73-78.) Plaintiff's claims allege disability beginning August 19, 2003, due to a back injury and depression. (Tr. 73-78.) Plaintiff filed prior applications for DIB and SSI on May 12, 2004, which were denied by the Administration on initial review. (Tr. 13.) Plaintiff did not seek reconsideration review for the prior applications. (Tr. 13.)

Plaintiff's current claims were denied at the initial (Tr. 61-64) and reconsideration (Tr. 57-58) levels of review by the state agency, whereupon Plaintiff requested and received a hearing before Administrative Law Judge ("ALJ") K. Dickson Grissom (Tr. 24-28, 56). The hearing was held on August 20, 2008, and Plaintiff appeared with counsel and gave testimony, as did an impartial vocational expert retained by the agency. (Tr. 596-611.) At the conclusion of the hearing, the ALJ took the matter under advisement until December 2, 2008, when he issued a written decision finding Plaintiff not disabled. (Tr. 13-21.) The ALJ's decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since August 19, 2003, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: chronic back pain and depression (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant is limited to occasional climbing of steps and ramps; stooping; crouching; and crawling. She must avoid all climbing of ropes, scaffolds, and ladders, twisting, and bending from waist to floor. The claimant requires a

sit/stand option at will. Due to mental difficulties, the claimant is limited to performing simple, repetitive non-detailed tasks where coworker and public contact is casual and infrequent, where supervision is direct and non-confrontational, and where changes in the workplace are infrequent and gradually introduced.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 22, 1960 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 19, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-16, 19-20.)

On November 25, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 2-4, 7), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c)(3). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3).

**II. Review of the Record**

Plaintiff was 48 years old as of the December 2, 2008, ALJ decision, which is the final decision at issue in this case. (Tr. 73.) She attended high school until her sophomore year and later obtained her general equivalency diploma (GED). (Tr. 469, 599.) Plaintiff previously

worked as a sales clerk and cashier at several retail and convenience stores. (Tr. 129.) In July 2003, Plaintiff fell at home and hurt her back. (Tr. 79.)

On August 1, 2003, Plaintiff presented to the Convenient Care Clinic complaining of back pain. (Tr. 365.) Her examining physician observed that Plaintiff had an abnormal gait and increased lumbar muscle spasms on the left and right. (Tr. 366.) Plaintiff also had pain to palpation over the left sacroiliac ("SI") joint, and range of motion of her lumbar spine elicited pain. (Tr. 366.) Plaintiff had negative straight leg raising and side bending. (Tr. 366.) Her examining physician diagnosed lumbar myositis, lumbar strain, SI dysfunction, lumbar disc disease, and ilioinguinal ligament strain. (Tr. 366.) Plaintiff was advised not to bend, lift, pull, or push. (Tr. 366.) Several days later, Plaintiff obtained an MRI scan of her lumbar spine, which showed a Schmorl's node involving the upper end plate of T11 and mild anterior wedging at T11, perhaps secondary to previous trauma. (Tr. 325.)

On August 18, 2003, Plaintiff presented to the emergency department of Cookeville Regional Medical Center complaining of radiating back pain. (Tr. 353-354.) She reported that she had fallen several weeks prior and her pain commenced the day after she fell. (Tr. 354.) She described burning, sharp pain, which she rated as an 8 to 9 out of 10. (Tr. 354.) Upon physical examination, Plaintiff was non-tender and had full range of motion, but she had positive straight leg raising on the left. (Tr. 355.)

On August 19, 2003, Plaintiff presented to Joseph A. Jestus, M.D., for evaluation of her back and leg pain. (Tr. 324.) Plaintiff described pain in her low back that radiated to her left anterior thigh. (Tr. 324.) She also described some paresthesias in her left anterior calf. (Tr. 324.) Dr. Jestus noted that Plaintiff's lumbar spine MRI scan showed a Schmorl's node at T11 and a far lateral left L3 disc herniation with compression on the left L3 nerve. (Tr. 324.) He also

4

observed that Plaintiff's motor exam was significant for weakness of the left thigh, and she had some trace weakness of the left anterior tibialis. (Tr. 324.) Dr. Jestus further observed that Plaintiff had difficulty standing up on a step, and she had an absent left knee jerk. (Tr. 324.) He assessed left L3 radiculopathy secondary to a far lateral left L3 disc herniation and recommended that Plaintiff undergo left far lateral L3 diskectomy. (Tr. 324.)

On August 25, 2003, Plaintiff underwent far lateral exposure of the L3 nerve, lateral foraminotomy over the L3 nerve, and L3 diskectomy. (Tr. 332-33.) Two days later, Plaintiff presented to the emergency department of Cookeville Regional Medical Center complaining of moderate pain in her left knee and leg. (Tr. 350-52.) Plaintiff reported that walking and movement exacerbated her pain, and nothing relieved it. (Tr. 351.) On August 29, 2003, Dr. Jestus noted that Plaintiff did well following surgery and her preoperative anterior thigh pain was resolved. (Tr. 348.) However, he noted that Plaintiff had persistent and progressive pain in her left anterior calf, which radiated to her left anterior thigh. (Tr. 348.) He also noted that Plaintiff's pain had become "quite severe." (Tr. 348.) He diagnosed Plaintiff with sciatica and left leg pain, which followed both an L3 and L4 nerve distribution. (Tr. 349.) He observed that Plaintiff was neurologically intact and recommended placing her on a steroid dose pack and narcotic pain medication. (Tr. 349.)

On September 5, 2003, Dr. Jestus noted that Plaintiff continued to have pain in her left anterior thigh that radiated to her anterior shin. (Tr. 402.) He noted that Plaintiff's pain seemed more like an L4 nerve distribution, rather than an L3 distribution. (Tr. 402.) Dr. Jestus opined that Plaintiff's postoperative leg pain was different from her preoperative pain, and that she may have had a new disc herniation. (Tr. 402.) He recommended observation of her pain because a new MRI scan could have been difficult to interpret so soon after her surgery. (Tr. 402.) Two

5

weeks later, Plaintiff returned with an MRI scan of her lumbar spine that was difficult to interpret because of her recent surgery. (Tr. 322.) Nevertheless, Dr. Jestus observed that Plaintiff appeared to possibly have either a recurrent small disc herniation just anterior to her L3 nerve or scar tissue formation. (Tr. 322.) He noted that although Plaintiff's anterior thigh pain resolved, her left anterior shin numbness had become painful. (Tr. 322.) He opined that Plaintiff's pain could have been caused by allodynia due to nerve injury from her disc herniation. (Tr. 322.) He further noted that Plaintiff's situation may have been as good as it was going to get for her, but he also noted that it would be worthwhile to explore her wound and examine her nerve once more. (Tr. 322.)

On September 19, 2003, Plaintiff underwent an MRI scan of her lumbosacral spine, which showed postoperative changes on the left involving the left lateral neural foramina at L3-4, which may have been impinging on her exiting left L3 nerve root. (Tr. 328.) A week later, on September 27, Plaintiff underwent re-do far lateral exposure of the left L3 nerve, left L3 diskectomy, and external neurolysis of the left L3 nerve root and L3 diskectomy utilizing an intraoperative microscope. (Tr. 330.) Several weeks after Plaintiff's second surgery, Dr. Jestus observed that her pain had not improved. (Tr. 321.) He did not find this to be surprising because he had not found a recurrent disc herniation. (Tr. 321.)

In December 2003, Dr. Jestus noted that Plaintiff was "quite miserable with pain." (Tr. 319.) He recommended that Plaintiff undergo one more MRI scan and an EMG study, but Plaintiff objected to the MRI scan. (Tr. 319.) He told Plaintiff that if all other alternatives failed, he would refer her to a pain center. (Tr. 319.) Plaintiff's EMG study showed predominantly sensory polyneuropathy without evidence of active left L4 or L5 radiculopathy. (Tr. 326.) Several days later, Dr. Jestus opined that Plaintiff has "quite severe" postoperative allodynia,

which would be very hard to control. (Tr. 318.) He noted that Plaintiff would not benefit from further surgery. (Tr. 318.)

In February 2004, Plaintiff presented to the Primary Care Pain Relief Centers ("Pain Relief Centers"). (Tr. 314.) She complained of lower back pain that radiated to her left leg. (Tr. 314.) She described numbness and pain, which she characterized as sharp, burning, and shooting. (Tr. 316.) She rated her pain as a 10 out of 10 at its worst and a 9 out of 10 at its best. (Tr. 316.) She indicated that her pain was exacerbated by bending, standing, and walking, and it prevented good sleeping, performing household chores, walking or exercising, and working. (Tr. 316.) She indicated that lying with a pillow improved her pain. (Tr. 316.) Two months later, a progress note from the Pain Relief Centers indicated that Plaintiff was only taking Percocet, which provided marginal relief, because she could not afford Duragesic patches. (Tr. 307.) Overall, Plaintiff had mildly decreased pain with increased functioning. (Tr. 307.)

In August 2004, state agency medical consultant Reeta Misra, M.D., completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (Tr. 275-82.) Dr. Misra opined that Plaintiff could occasionally lift and carry up to twenty pounds, and she could frequently lift and carry up to ten pounds. (Tr. 276.) She further opined that Plaintiff could stand at least two hours and sit about six hours in an eight-hour workday. (Tr. 276.) She also opined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 277.) Approximately two years later, in July 2006, state agency medical consultant Robin W. Richard, M.D., completed a physical RFC assessment and concurred with all of Dr. Misra's medical opinions, except that Dr. Richard opined that Plaintiff could frequently balance and she could not ever climb ladders, ropes, or scaffolds. (Tr. 445.)

In October 2005, Plaintiff presented to the Baxter Medical Clinic ("Baxter") to discuss her depression and to commence pain management treatment at Baxter instead of Pain Relief Centers . (Tr. 437.) Plaintiff was advised that her pain narcotics were likely aggravating her depression. (Tr. 437.) Several weeks later, Plaintiff returned to Baxter and reported that she felt sad, that she was experiencing low self-esteem and was overeating, that her pain was not under control, and that she was embarrassed to go out because of a limp secondary to her pain. (Tr. 436.)

In June 2006, Plaintiff underwent an X-ray of her lumbosacral spine that showed minimal degenerative changes in the lower lumbar spine and left SI joint. (Tr. 467.) Several days later, Plaintiff presented to Roy Johnson, M.D., for a consultative examination. (Tr. 465.) Dr. Johnson observed that Plaintiff had a positive toe walk, and she walked with a limp. (Tr. 466.) He also noted that Plaintiff's seated straight leg raise and supine straight leg raise were both positive on the left. (Tr. 466.) Dr. Johnson opined that Plaintiff experienced low back syndrome with radiculopathy. (Tr. 466.) He also noted that she had a history of depression. (Tr. 466.) Regarding Plaintiff's work-related abilities, Dr. Johnson further opined that Plaintiff could stand for two hours in an eight-hour workday, alternating between sitting and standing as needed, but should not lift more than five pounds occasionally. (Tr. 466.) He also opined that Plaintiff should avoid overhead lifting and repetitive bending and twisting of the back. (Tr. 466.) He noted that Plaintiff should not exceed any restrictions imposed by her treating physician.

On June 14, 2006, Plaintiff presented to Linda Blazina, Ph. D., a clinical psychologist, for a consultative clinical interview and mental status examination. (Tr. 468.) Plaintiff reported recurrent symptoms of feeling hopeless and irritable, crying spells, and lacking interest in activities. (Tr. 469.) She also reported having difficulty concentrating and feeling depressed and

8

anxious most days. (Tr. 469.) She also described sleep and appetite problems, and stated that all of her psychological symptoms occurred following her back injury in 2003. (Tr. 469.) She further stated that she could care for herself independently, but needed assistance getting in and out of the bathtub. (Tr. 471.) Dr. Blazina observed that Plaintiff walked slowly and had a noticeable limp, that she appeared anxious and had difficulty sitting still, and that her mood appeared dysphoric and somewhat labile. (Tr. 468-69.) Plaintiff's reality testing did not demonstrate any impairment, and her judgment and insight appeared intact. (Tr. 471.) Her social behavior was appropriate throughout the evaluation, but she reported being socially isolated and sometimes preferring to be alone. (Tr. 471.) Dr. Blazina noted that Plaintiff's attention and concentration skills were impaired due to her restlessness and psychological symptoms, but her memory functioning did not appear to be impaired. (Tr. 471.) Dr. Blazina opined that Plaintiff experienced an adjustment disorder with mixed anxiety and a depressed mood. (Tr. 472.) She assigned Plaintiff a global assessment of functioning ("GAF") score of 70. (Tr. 472.) She further opined that Plaintiff's ability to understand and remember was not limited, but her ability to sustain concentration and persistence was mildly limited due to anxiety and depression. (Tr. 472.) She also opined that Plaintiff's social interaction abilities were not significantly limited, but her ability to adapt to changes in a workplace and tolerate normal workplace stress was mildly limited due to anxiety and depression. (Tr. 472.)

On July 10, 2006, state agency medical consultant Andrew J. Phay, Ph. D., completed a Psychiatric Review Technique Form in which he opined that Plaintiff experienced mild restriction of daily living activities and mild difficulties maintaining concentration, persistence, and pace. (Tr. 451-61.) He further opined that Plaintiff did not experience any difficulties in maintaining social functioning, and she did not experience any episodes of decompensation. (Tr.

461.) Dr. Phay determined that Plaintiff's mental impairment was not severe, and he noted that Plaintiff's depression arose after her back injury. (Tr. 463.)

In November 2007, Plaintiff presented to Volunteer Behavioral Health Care System ("Volunteer") for treatment of her depression. (Tr. 254-57.) Plaintiff reported that she had become impatient and more emotional with low motivation and drive. (Tr. 254.) Jerrell Killian, a licensed professional counselor, performed a mental status examination of Plaintiff and found that she was able to make calculations involving compound fractions. (Tr. 256.) Plaintiff had good awareness of international and local events, and she had very good answers to judgment questions. (Tr. 256.) She was able to recall three items after fifty minutes, and she did not demonstrate any signs of aberrant thinking or report any experiences suggestive of hallucinations or delusions. (Tr. 256.) Mr. Killian diagnosed dysthymic disorder, late onset, without atypical features. (Tr. 257.) He assigned Plaintiff a GAF score of 55. (Tr. 257.) Plaintiff returned to Volunteer one month later and Mr. Killian noted that she focused on her areas of stress, which were primarily taking care of her grandchildren and constant pain. (Tr. 239.)

At the administrative hearing on December 12, 2008, Plaintiff testified that she was unable to work because she could not sit or stand for long periods of time and experienced constant pain. (Tr. 600-01.) She testified that she spends most of the day watching television, reading, going outside, and walking "a little bit" to see her mother-in-law. (Tr. 600.) She stated that she lost her TennCare medical assistance, and she had not taken prescribed pain medication since 2006 because she could not afford it. (Tr. 601.) She testified that she took over-the-counter pain medication every four hours, which provided only a small amount of relief. (Tr. 605.) She testified that her husband was disabled, and that they helped one another to perform household chores. (Tr. 601-02.) She also testified that she obtained treatment from Plateau Mental Health

10

Center[2] ("Plateau") beginning in 2007, and that the treatment improved her symptoms. (Tr. 605-06.) She testified that she still experienced difficulty sleeping when her pain was bad, and she awoke about three nights each week due to pain. (Tr. 606-07.)

In response to the ALJ's hypothetical question[3] regarding the availability of work for an individual with Plaintiff's RFC, age, experience, and education, an impartial vocational expert testified that Plaintiff could not go back to any of her prior jobs, but that she could perform repetitive, sedentary jobs, such as label cutter, cup folder, bottling line attendant, thermostat inspector, small parts packer, and ticketing machine operator. (Tr. 608-09.) The vocation expert testified that, of such jobs, there were 350 locally and 500,000 nationally. (Tr. 609.)

**III. Conclusions of Law**

    A. <u>Standard of Review</u>

This court reviews the final decision of the SSA to determine whether than agency's findings of fact are supported by substantial evidence in the record and whether the correct legal

---

[2] Volunteer is the parent organization of Plateau Mental Health Center. (Tr. 239.)

[3] The ALJ presented the following hypothetical to the vocational expert:

> Assume, Dr. Nadolsky, on the basis of the credible evidence that I would find this claimant['s] demonstrated exertional impairments would reflect residual functional capacity for a range of light work. And I want you to also consider that I might find her with a sedentary residual functional capacity. I want you to assume that I would find her to be limited to standing and walking no more than two hours of an eight hour day. And, of course, in order to accomplish that she would require accommodations in the form of a sit/stand option. And I want you to consider that option to be at will option which would allow her to perform work either seated or standing whichever would be most comfortable at the moment. Also assume I would find her to be precluded from no more than occasional climbing of stairs and ramps, stooping, crouching, and crawling. She would be precluded from any climbing of ladders, ropes, and scaffolds, or any bending, or twisting her back. I'm sorry, bending waist below or twisting her back. And let's consider that she would require work involving no more than simple, repetitive, non detailed tasks. Her co-worker and public contact would be no more than casual and infrequent. Supervision would be direct and non confrontational. And changes in the workplace infrequent and gradually introduced. Under that hypothetical could she return to her prior job?

(Tr. 608.)

11

standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

      B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death of which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007) (citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006) (en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, at *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and

13

nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), 423(d)(5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff asserts two grounds for reversal of the ALJ's decision. First, Plaintiff argues that the ALJ failed to give adequate weight to the consultative physician, Dr. Roy Johnson, and failed to give any reason for rejection of his assessment. Plaintiff specifically contends that the ALJ did not properly consider Dr. Johnson's opinion that she should be limited to lifting five pounds, that the ALJ did not give reasons for rejecting Dr. Johnson's opinion, and, therefore, that the ALJ's hypothetical question posed to the vocational expert was defective because it limited Plaintiff to lifting ten pounds, instead of five pounds. (Docket Entry No. 13, Pl.'s Brief in Supp. at 12-13.)

As to Plaintiff's first assignment of error, the parameters for weighing medical opinion evidence are provided in § 404.1527 of the Administration's regulations for DIB claims and § 416.927 for SSI claims. When the opinion of the claimant's treating provider meets significant opposition in the record, and a decision must be made as to which opinion(s) most accurately describes the claimant's condition, the regulations establish a general preference for examining source opinions over the opinions of nonexamining sources, and among examining sources, for those who have a treatment relationship with the claimant over those who do not. 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Furthermore, the regulations generally require that more weight be given the opinion of a specialist about issues within his or her specialty than to the opinion of a generalist. 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5). Aside from these issues relating to the status of the medical source, the regulations prefer those opinions that are better explained and better supported by medical signs and laboratory findings, as well as those that are consistent with the record as a whole. 20 C.F.R. §§ 404.1527(d)(3)-(4), 416.927(d)(3)-(4).

Importantly, the Sixth Circuit has noted that "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." Rogers, 486 F.3d at 242. Accordingly, whenever the weight of a treating source opinion is discounted, claimants are assured that they will be provided with "good reasons" for the weight given their doctor's opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The regulatory requirement of good reason-giving has been described by the Sixth Circuit as an "important procedural safeguard" which the agency cannot disregard in an *ad hoc* fashion. Bowen v. Comm'r of Soc. Sec., 478 F.3d 742, 747 (6th Cir. 2007) (quoting Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004)).

In this case, Dr. Johnson's opinion, as the consulting physician, is not entitled to the deference due a treating physician, but he is the only examining source in this case who provided an opinion regarding Plaintiff's work-related limitations. The ALJ adopted all of the restrictions in Dr. Johnson's opinion except the lifting restriction that would have likely eliminated sedentary work without explaining his decision to do so. However, the Sixth Circuit has consistently held that the requirement that an ALJ "give good reasons" for his determination of weight to be given to an opinion only applies to the opinions of treating physicians, not examining physicians. Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010) (citing Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 876 (6th Cir. 2007)). It was within the ALJ's discretion to determine the weight to be given to each opinion in determining Plaintiff's lifting restrictions, and it appears from the record that the ALJ gave significant weight to Dr. Johnson's opinion while also accounting for the less restrictive assessments of two state agency medical consultants. The undersigned finds no error in this weighing of the objective medical proof. As such, Plaintiff's contention that the

ALJ's hypothetical question to the vocational expert was correspondingly defective is without merit. Thus, the undersigned finds no reversible error in Plaintiff's first claim of error.

Second, Plaintiff argues that the ALJ's analysis of the credibility of her subjective complaints is insufficient. Under the regulations, 20 C.F.R. §§ 404.1529(c), 416.929(c), the ALJ, upon finding "a medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms," is required to then evaluate the intensity and persistence of the symptoms by reference to the record as a whole, including both the objective medical evidence and other evidence bearing on the severity of the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3). There is no question that a claimant's subjective complaints can support a finding of disability—irrespective of the credibility of that claimant's statements—if they are grounded in an objectively established, underlying medical condition and are borne out by the medical and other evidence of record. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); see, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); Soc. Sec. Rul. 96-7p, 1996 WL 362209, 61 Fed. Reg. 34483, at *34484-85 (describing the scope of the analysis as including "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists or other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record"; "[A] finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled."). Such "other evidence" which the ALJ is bound to consider includes evidence of the following factors:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

It is well established that an ALJ may properly consider the credibility of a claimant in conjunction with his consideration of the medical and other evidence described above, and that this credibility finding is due great weight and deference in light of the ALJ's opportunity to observe the claimant's demeanor while testifying. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). In considering the ALJ's finding on the weight of plaintiff's subjective complaints, this court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [plaintiff] are reasonable and supported by substantial evidence in the record." Id.

In this case, the undersigned finds that the ALJ's analysis of the credibility of Plaintiff's subjective complaints is not supported by substantial evidence. While the ALJ made brief reference to some of the factors for consideration, he did not discuss any of them. The ALJ did not meaningfully consider the medications that Plaintiff was taking for her "quite severe" pain. Dr. Jestus[4] prescribed Plaintiff large doses of Neurontin and Percocet (5 mg). (Tr. 318-19.) After Dr. Jestus determined that, despite two surgeries, there was nothing more that he could do for Plaintiff, he sent her to the Pain Centers where her Percocet dosages were increased significantly

---

[4] As both Plaintiff's treating physician and a neurological specialist, Dr. Jestus's opinion is entitled to great deference regarding Plaintiff's level of neurological pain. 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2); 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5).

(10 mg), she continued her dosages of Neurontin, and she was additionally prescribed Duragesic (50 mg) and Flexeril. (Tr. 313.) These large quantities of narcotic and neuropathic pain medication tend to support Plaintiff's subjective complaints regarding the intensity and duration of her pain. Moreover, the record is replete with evidence of positive straight leg raise, abnormal gait, and positive muscle spasms, which also support Plaintiff's subjective complaints of pain.

      The ALJ supported his determination that Plaintiff's complaints were not credible based largely on the fact that Plaintiff testified she could do light housework and that the record contained mental health notes regarding Plaintiff's stress over her inability to care for her grandchildren. (Tr. 19, 184, 239, 241, 254.) However, Plaintiff gave no testimony at the hearing regarding her activities related to being a caregiver to her grandchildren. It is not clear from the record whether Plaintiff reported stress from being the "caregiver" for grandchildren or whether she felt stress because she was unable to care for them, nor even whether such care giving was in a physical or financial form. Furthermore, Plaintiff's testimony regarding her very minimal daily activities is hardly such relevant evidence as a reasonable mind might accept as adequate to support the conclusion that Plaintiff's subjective complaints were not credible. Rogers, 486 F.3d at 248-49 (noting that such "minimal daily functions are not comparable to typical work activities."). Plaintiff's abilities to manage her finances, prepare very basic meals, and walk next door to visit her in-laws are insufficient to conclude that Plaintiff was exaggerating her claims of pain. As such, this case should be reversed and remanded for reconsideration of Plaintiff's role with respect to caring for her grandchildren and for further consideration of Plaintiff's pain related limitations, in light of both the objective medical evidence and other evidence bearing on the severity of her symptoms.

In summary, the undersigned finds that Plaintiff's first claim of error does not require reversal. The ALJ properly considered Dr. Johnson's opinion and was not required to give any special deference to Dr. Johnson's opinion. However, the undersigned finds that Plaintiff's second claim of error merits reversal and remand as the ALJ erred in discrediting Plaintiff's statements regarding the intensity and persistence of her symptoms where there was not substantial evidence to support the ALJ's credibility finding.

## **RECOMMENDATION**

For the reasons stated above, the undersigned Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record be **GRANTED**, and that the decision of the SSA be **REVERSED** and the cause **REMANDED** for further administrative proceedings consistent with this Report.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from service of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

**ENTERED** this 2nd day of August, 2011.

        s/ John S. Bryant
        JOHN S. BRYANT
        United States Magistrate Judge